## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**HENRY COFFEEN III MANAGEMENT,
INC., d/b/a COFFEEN MANAGEMENT
COMPANY,**

      **Plaintiffs,**

**v.**                                       **17cv96 MCA/SMV**

**TATE BRANCH; TATE BRANCH
AUTOMOTIVE ENTERPRISES, LLC, d/b/a
TATE BRANCH AUTO GROUP; MIKE GODIN
and GODIN DEALER SERVICES, LLC.**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on two *Motions to Dismiss* submitted by Defendants Mike Godin and Godin Dealer Services, LLC (GDS) [Doc. 11] and Defendants Tate Branch and Tate Branch Automotive Enterprises, LLC, [Doc. 8, 9] (collectively, Defendants) as well as the *Opposed Motion for Leave to File an Amended Complaint* filed by Plaintiff Henry Coffeen III Management d/b/a Coffeen Management Company (CMC). [Doc. 16] The Court has considered the parties' submissions and the relevant law, and is otherwise fully informed. For the following reasons, the Court **GRANTS** Plaintiff's *Opposed Motion for Leave to File an Amended Complaint*. Grant of that motion renders the Defendants' *Motions to Dismiss* moot. Both *Motions* therefore shall be **DENIED** as moot.

## I.    Background

The following facts are taken from Plaintiff's *First Amended Complaint*, the allegations in which, for purposes of the present *Motions*, the Court takes as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  CMC is a Texas corporation "engaged in the highly competitive business of marketing revenue-enhancement products and process-development strategies, including management consulting services, to automobile, power sports, and recreational vehicle dealerships through the United States."  [Doc. 16-2, *First Amended Complaint*, ¶¶ 1, 8]  CMC "sells revenue-generating finance, insurance, and warranty products to its clients through sales personnel."  [Doc. 16-2, *First Amended Complaint*, ¶ 10]  One of the products CMC sells as an agent is called "Warranty Forever®".  [Doc. 16-2, *First Amended Complaint*, ¶ 32]

Thomas "Bear" Musgrave, IV, Christina Morton, and Richard Dewese (the Employees) were employees and/or officers of CMC until they resigned in December, 2015 (Musgrave) and January, 2016 (Morton and Dewese).  [Doc. 16-2, *First Amended Complaint*, ¶¶ 17, 25, 28, 56, 58, 60]  Defendant Tate Branch Automotive Enterprises, d/b/a Tate Branch Auto Group (TBAG) is a New Mexico limited liability company that owns three automobile dealerships in Artesia, Carlsbad, and Hobbs, New Mexico.  [Doc. 16-2, *First Amended Complaint*, ¶ 3]  TBAG was a customer of CMC's beginning in September, 2014, and generated close to $400,000 in annual gross revenue to CMC. [Doc. 16-2, *First Amended Complaint*, ¶¶ 32, 39]  After they left CMC, the Employees began working for TBAG.  [Doc. 16-2, *First Amended Complaint*, ¶ 60]  Scott Baez (Baez) worked for CMC until March, 2015, when he began working for TBAG.  [Doc.

16-2, *First Amended Complaint*, ¶¶ 31, 34]  Prior to September, 2014, TBAG had been doing business with Defendant GDS, a New Mexico limited liability company.  [Doc. 16-2, *First Amended Complaint*, ¶¶ 5, 33]

The present action arises from a series of events occurring around the time that Employees left CMC to work for TBAG.  In 2015, the Employees learned of an opportunity to purchase the Permian Auto Group and communicated the opportunity to Branch and CMC.  [Doc. 16-2, *First Amended Complaint*, ¶¶ 41-45]  Together, the Employees, Branch, and CMC developed a plan to "share in the ownership" of the Permian Auto Group, but the Employees, Branch, and Baez decided later to cut CMC out of the ownership.  [Doc. 16-2, *First Amended Complaint*, ¶¶ 45-46]  Having made this decision, "these individuals began discussing how Branch and/or TBAG could terminate TBAG's business relationship with CMC and either: (1) establish a new business directed at providing products and services that were comparable to what CMC was already providing to TBAG; or (2) align[] with a competitor of CMC's to obtain replacement products."  [Doc. 16-2, *First Amended Complaint*, ¶ 47]  "The plan was discussed in the context of a joint venture between Branch, Godin, Musgrave, Morgan and Dewese, in which each would profit from the venture."  [Doc. 16-2, *First Amended Complaint*, ¶ 55]  In December, 2015, the Employees met with Branch, Baez, and Godin and brought to the meeting "copies of the non-compete agreements they had signed with CMC and there was discussion with Godin and Branch about how to work around the non-disclosure and non-compete provisions in those agreements during implementation of the plan.  [The

Employees] were still working for CMC at the time of the December, 2015 meeting."
[Doc. 16-2, *First Amended Complaint*, ¶ 54]

When CMC learned, in December, 2015, that Musgrave had contacted TBAG "in an apparent effort to divert business from CMC," it sent letters to Musgrave and Morgan "reminding them of their contractual obligations under their non-compete agreements with CMC." [Doc. 16-2, *First Amended Complaint*, ¶¶ 58-59] On December 30, 2015, CMC filed a petition in a Texas district court for a temporary restraining order and permanent injunction seeking to enjoin Musgrave and Morgan from using or disclosing any of CMC's confidential information and trade secrets. [Doc. 11-1, pg. 21; Doc. 16-2, *First Amended Complaint*, ¶ 64] On February 1, 2016, a temporary restraining order was entered, enjoining Musgrave and Morgan from

> a. directly or indirectly calling upon, meeting with, communicating with, or soliciting for the purpose of selling or marketing any products or services which comprised any part of CMC's business to certain of CMC's Clients;

> b. accepting any business from certain of the CMC Clients on their own behalf or on behalf of any other person or entity;

> c. using or disclosing, directly or indirectly, to any person or entity, or for any purpose, any part of CMC's confidential information and trade secrets, including, without limitation, any of CMC's confidential information and trade secrets that was transmitted by such individuals to their personal e-mail accounts and/or personal computers or other electronic storage devices; and

> d. altering, deleting, destroying, hiding, secreting or otherwise removing from the jurisdiction of the 96th Judicial District Court of Tarrant County, Texas any document, record, disc or other written or electronic media, including those contained on any personal computer or electronic storage

device, which contains or describes any of CMC's confidential information and trade secrets.[1]

[Doc. 16-2, *First Amended Complaint*, ¶ 65]  A few days later, the Employees, Branch, and Baez met at a TBAG dealership to have a conference call with Godin.  [Doc. 16-2, *First Amended Complaint*, ¶ 68]  Baez, at Branch's instruction, did all the talking with Godin, and the Employees supplied Baez with questions and answers via handwritten notes.  [Doc. 16-2, *First Amended Complaint*, ¶ 75]  Using these methods, the Employees disclosed confidential information to Godin and GDS about Warranty Forever®, including "all costs to CMC related to that product."  [Doc. 16-2, *First Amended Complaint*, ¶ 76]

In essence, Plaintiff alleges that Employees were induced by Defendants to share confidential information and trade secrets, known to them only through their employment with CMC, with TBAG and GDS so that GDS could replace CMC in providing services and products to TBAG.  In its *Complaint*, filed January 18, 2017, Plaintiff alleges Defendants 1) aided and abetted a breach of fiduciary duty owed by Employees to CMC, 2) violated the New Mexico Uniform Trade Secrets Act, and 3) engaged in a civil conspiracy.  [Doc. 1]  Defendants have moved to dismiss the *Complaint* on the ground that Plaintiff has failed to state a claim against them.  [Doc. 8, 9, 11]  Plaintiff argues that the *Complaint* is sufficient, but nevertheless moves to amend the *Complaint*.  [Doc. 16, 17, 18]  The *Motion for Leave to File an Amended Complaint* was filed twenty-eight days

---

[1]  The Texas district court subsequently denied Plaintiff's *Application for Temporary Injunction* against Musgrave.  [Doc. 11-3]  The Texas Court of Appeals affirmed.  [Doc. 26-1]

after the *Motions to Dismiss*. *See* Fed.R.Civ.P. 15(a)(2) (stating that unless an amendment is filed within twenty-one days of a responsive pleading, "a party may amend its pleading only with the opposing party's written consent or the court's leave.").

## II. Discussion

The first question presented is the order in which to consider the pending motions. Generally speaking, Federal Rule of Civil Procedure 15(a) allows a party to amend its pleading by leave of the court after a responsive pleading is served, and provides that leave shall be freely given when justice so requires.

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962); *see Castleglen, Inc. v. Resolution Trust Corp.*, 984 F.2d 1571, 1585 (10th Cir. 1993) (citing cases). "Although Fed.R.Civ.P. 15(a) provides that leave to amend shall be given freely, the district court may deny leave to amend where amendment would be futile." *Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Id.*

Defendants do not argue that they will suffer undue prejudice if the amendment is granted, or that Plaintiff has acted in bad faith. Defendants' only argument in opposition to the proposed *First Amended Complaint* is that the proposed amendment is futile because it fails to adduce facts necessary to support Plaintiff's claims, an argument

closely related to Defendants' *Motions to Dismiss*, in which Defendants argue that the allegations in the original *Complaint* fail to state a claim and that the *Complaint* must be dismissed under Rule 12(b)(6). [Doc. 8, 9, Doc. 11] Here, in essence, Plaintiff's *Opposed Motion for Leave to File an Amended Complaint* seeks to modify the *Complaint* to address the deficiencies identified by Defendants' *Motions to Dismiss*. [Doc. 16] Thus, if the *First Amended Complaint* rectifies any such deficiencies, the *Motions to Dismiss* are moot. *Cf. Gotfredson v. Larsen LP*, 432 F. Supp. 2d 1163, 1172 (D. Colo. 2006) (stating that "[a] pleading that has been amended under Federal Rule of Civil Procedure 15(a), supersedes the pleading it modifies" and that "motions to dismiss [filed before an amended pleading] are technically moot because they are directed at a pleading that is no longer operative."). However, if the *First Amended Complaint* also fails to state a claim, then the amendment would be futile and the Court may properly deny leave to amend. *Ketchum v. Cruz*, 961 F.2d 916, 920 (10th Cir. 1992) (stating that a district court is "justified in denying the motion to amend if the proposed amendment could not have withstood a motion to dismiss or otherwise failed to state a claim."). The Court will therefore consider Plaintiffs' *Opposed Motion for Leave to File an Amended Complaint*. In doing so, the Court will determine whether the deficiencies alleged in the *Motions to Dismiss* have been rectified. *See Jefferson Cty. Sch. Dist. No. R-1,* 175 F.3d at 859 (stating that "in determining whether the district court abused its discretion in denying the [plaintiff]'s motion for leave to amend, we consider the sufficiency of the antitrust claims that it sought to add in its [s]econd [a]mended [c]omplaint"); *Bauer v. City & Cty. of Denver*, 642 F. App'x 920, 925 (10th Cir. 2016) (unpublished) (affirming the district

court's denial of a motion to amend where the district court considered whether the proposed amended complaint stated a claim or was futile); *Gotfredson,* 432 F. Supp. 2d at 1172 (assessing a motion to dismiss vis a vis an amended complaint where the movant requested the court to do so).

In *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), the Supreme Court held that, "to withstand a motion to dismiss, a complaint must have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.' " *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 570). In applying this test, a court accepts as true all well-pleaded facts alleged in the plaintiff's complaint but does not accept the plaintiff's legal conclusions. *Iqbal*, 556 U.S. at 679. In short, in ruling on a Rule 12(b)(6) motion, "a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Collins*, 656 F.3d at 1214. In the circumstances here, if the allegations are sufficient, the amendment is not futile and leave to file will be granted.

## A. Preliminary Matters

As a preliminary matter, the Court declines at this stage of the proceedings to resolve the collateral estoppel issue raised by Defendants. Defendants contend that because a Texas court held that the non-compete agreements at issue here are unenforceable, Plaintiff is collaterally estopped from arguing to the contrary. [Doc. 28, pg. 4; Doc. 26, 4-5] Plaintiff argues that the issue has not been fully decided because the Texas Court of Appeals has not addressed it. [Doc. 34, pg. 5-6]

Collateral estoppel will bar litigation of an issue if four elements are met:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been *finally adjudicated on the merits*, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had *a full and fair opportunity to litigate* the issue in the prior action.

*Frandsen v. Westinghouse Corp.*, 46 F.3d 975, 978 (10th Cir. 1995) (Emphasis added) (internal quotation marks and citation omitted). Generally, "[f]indings made in a preliminary injunction proceeding are seldom considered sufficiently final to be given issue preclusive effect." James Wm. Moore, Moore's Federal Practice, §132.05[5][b] (2013 3rd ed.); *Kuzinich v. Santa Clara Cty.*, 689 F.2d 1345, 1350 (9th Cir. 1982) (holding that "issues litigated in a preliminary injunction action . . . do not form a basis for collateral estoppel" because "[t]he granting or denial of a preliminary injunction does not amount to an adjudication of the ultimate rights in controversy."). "There are exceptions to the general rule, arising in circumstances where a ruling is rendered 'practically' final owing to factors demonstrating that it was not avowedly tentative, the adequacy of the hearing, and the opportunity for review." *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 754 (S.D.N.Y.), *on reargument,* 742 F. Supp. 786 (S.D.N.Y. 1990) (alterations, internal quotation marks, and citation omitted).

Here, neither party addresses whether the Texas district court's findings issued vis a vis an application for temporary injunction should be subject to the general rule or its exception. While the Texas district court's written order is not "avowedly tentative," neither were the findings final, as the order contemplated a trial on the merits four months

hence. [Doc. 11-3] In addition, there was no opportunity for review of the court's findings, because the Texas Court of Appeals expressly declined to address the findings on the merits and instead affirmed on the ground that the non-compete agreement did not restrict post-termination conduct. [Doc. 26-1, pg. 7-8 (stating "it is unnecessary for us to evaluate the enforceability of the Non-Compete Agreement under section 15.50 because . . . the non[-]compete and antisolicitation provisions do not restrict Musgrave's post-termination activities.").  Finally, neither party addresses the adequacy of the hearing on the matter and whether Plaintiff had a "full and fair opportunity to litigate" the issue. *See Commodity Futures Trading Comm'n v. Bd. of Trade of City of Chicago*, 701 F.2d 653, 658 (7th Cir. 1983) (holding that findings from a preliminary injunction hearing should be given preclusive effect where they were "entered after a six-day hearing . . . and were affirmed unanimously by a panel of [the appellate] court in a published opinion after full briefing and oral argument").  In the absence of briefing from the parties on this issue, the Court declines at this time to resolve the issue.

Resolution of whether Plaintiff is precluded from arguing that the non-compete agreement with Musgrave is enforceable is not necessary to address Plaintiff's *Motion for Leave to File an Amended Complaint*.  In the context of the Court's analysis, even if the non-compete agreement is not enforceable, Plaintiff's allegations related to the agreement go to Defendants' knowledge of the Employees' fiduciary duties and to the Employees' relationship with CMC.  The enforceability of the non-compete agreement is therefore not integral to the Court's assessment of the sufficiency of Plaintiff's claims.

**B. Aiding and Abetting**

Plaintiff first alleges that Defendants aided and abetted a breach of a fiduciary duty when "[Defendants] intentionally provided substantial assistance, encouragement, and monetary inducements to [the Employees] to commit acts which [D]efendants knew to be a breach of fiduciary duties owed to [Plaintiff]." [Doc. 16-2, ¶ 86] "New Mexico recognizes tort liability for the aiding and abetting of a breach of fiduciary duty." *GCM, Inc. v. Kentucky Cent. Life Ins. Co.*, 1997-NMSC-052, ¶ 17, 124 N.M. 186, 947 P.2d 143.

> In order to state such a claim, a plaintiff must allege and prove the following: (1) a fiduciary of the plaintiff breached a duty owed to the plaintiff; (2) the defendant knew of such a duty; (3) the defendant intentionally provided substantial assistance or encouragement to the fiduciary to commit an act which the defendant knew to be a breach of duty; and (4) damages to the plaintiff were caused thereby.

*Id.* Moreover, "[a]n injured party need not have a direct relationship with the third party against whom liability is sought as an aider and abettor." *Id.* ¶ 18. "Rather, the injured party must have a fiduciary relationship with the principal tortfeasor, and the third party must occupy the role of an accomplice in relation to the principal tortfeasor." *Id.*

Here, Plaintiff alleges that the Employees were employees and/or officers of CMC and as such owed CMC a duty of "good faith, loyalty, due care, and disclosure." Black's Law Dictionary 743 (10th ed. 2014) (defining a "fiduciary" as one who owes "the duties of good faith, loyalty, due care, and disclosure"); *see Isengard*, 1978-NMCA-117, ¶¶ 8-9 (discussing duties owed by employees to the corporation). [Doc. 16-2, *First Amended Complaint*, ¶¶ 17-30, 83] It alleges that the Employees "breached their respective fiduciary duties owed to CMC by disclosing CMC's confidential information and trade

secrets to [Defendants]" during a conference call with Defendants in February, 2016, [Doc. 16-2, *First Amended Complaint*, ¶¶ 67-68, 76] and that Defendants "knew, by virtue of CMC's past employment of [the Employees] as officers and senior managers of CMC, that [the Employees] were in a fiduciary relationship with CMC." [Doc. 16-2, *First Amended Complaint*, ¶¶ 82, 83] In support of these allegations, Plaintiff asserts that Defendants knew of confidentiality and non-compete agreements signed by the Employees "from discussions in the December, 2015 meeting" and that the Employees had "brought . . . copies of the non-compete agreements they had signed with CMC [to that meeting] and there was discussion with [Defendants] about how to work around the non-disclosure and non-compete provisions in those agreements." [Doc. 16-2, *First Amended Complaint*, ¶¶ 54, 84] It alleges that both Branch and Godin were present at the December, 2015 meeting. [Doc. 16-2, *First Amended Complaint*, ¶ 50] These facts are sufficient to allege that the Employees had a fiduciary duty, that Defendants knew of that duty, and that Employees breached the duty when they disclosed information about CMC's "pricing, margins, coverage limits and product costs associated with the products that CMC had been providing to TBAG" to Defendants. [Doc. 16-2, *First Amended Complaint*, ¶ 72]

As to inducement, Plaintiff alleges that Branch paid the Employees "$10,000 per month and . . . offer[ed] them employment at TBAG" in return for disclosure of CMC's confidential information. [Doc. 16-2, *First Amended Complaint*, ¶ 77] Plaintiff also alleges that, after they left CMC, the Employees in fact did begin working for TBAG. [Doc. 16-2, *First Amended Complaint*, ¶ 60] Plaintiff also alleges that GDS did not have

a product akin to Warranty Forever® and wanted to develop a similar product so that GDS could provide it to TBAG. [Doc. 16-2, *First Amended Complaint*, ¶¶ 51-53] In support of this allegation, Plaintiff asserts that

> 53. Godin assured Branch, Musgrave, Baez, Morgan and Dewese that he could, and would, develop a product to replace the Warranty Forever product with their assistance.
>
> . . .
>
> 61. On January 11, 2016, Godin sent an e-mail to Branch and Baez requesting information "pertinent to setting up the Lifetime Warranty (warranty forever replacement program)."
>
> 62. Branch instructed Baez to work with Godin to get him whatever information he needed in order to build the replacement products that GDS would provide TBAG. Some of the information Godin needed was not readily available to Baez or anyone else at TBAG.

[Doc. 16-2, *First Amended Complaint*, ¶¶ 53, 61-62] Plaintiff alleges that TBAG's business generated approximately $400,000 in revenue to CMC, which implies that GDS stood to gain that amount if it began providing those services to TBAG. [Doc. 16-2, *First Amended Complaint*, ¶ 39] Finally, Plaintiff alleges facts that support an inference that Godin knew that the Employees were providing confidential information to him about Warranty Forever® and other aspects of CMC's business. For instance, Plaintiff alleges that Godin participated in a meeting in which the parties discussed how to work around the Employees' non-disclosure agreements and a meeting in which actual disclosure occurred. [Doc. 16-2, *First Amended Complaint*, ¶ 50, 54, 68, 76] It alleges that prior to those meetings, "Musgrave had additional conversations with Godin about the plan to divert business from CMC" and that Godin requested information on Warranty Forever®

from Branch and Baez via email.  [Doc. 16-2, *First Amended Complaint*, ¶¶ 56, 61]

Construed in the light most favorable to Plaintiff, these allegations are sufficient to

support a claim that Branch and Godin assisted or encouraged the Employees to disclose

CMC's confidential information.

Finally, Plaintiff alleges that "[a]s a direct and proximate result of [the

Employees'] breach of their respective fiduciary duties to CMC, CMC has suffered and

will continue to suffer substantial harm and damages in the amount of at least $200,000

and such greater amount to be proven at trial."  [Doc. 16-2, *First Amended Complaint*, ¶

87]

The Court finds that Plaintiff has alleged sufficient facts, with adequate

particularity, to state a claim for aiding and abetting a breach of fiduciary duty in the

*First Amended Complaint*.  Thus, amendment of this claim is not futile and should be

permitted.

## C. Violation of the New Mexico Trade Secrets Act (NMUTSA)

The NMUTSA provides a remedy for misappropriation of trade secrets.  NMSA

1978, § 59-3A-1 to -7 (1989).  A trade secret is

information, including a formula, pattern, compilation, program, device, method, technique or process, that:

(1) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

§ 57-3A-2 (D). "General skills and knowledge do not rise to the level of trade secrets." *Insure New Mexico, LLC v. McGonigle*, 2000-NMCA-018, ¶ 18, 128 N.M. 611, 995 P.2d 1053. Neither does information about "business relationships," such as contact information, when it is generally known or ascertainable. *Id*. ¶ 20 (stating that "[i]f other insurance agents were aware [of the identity of] the individual to call at [a customer's business], we fail to see how that information can be considered a trade secret or confidential information."). However, a database of client information may constitute a "trade secret" if it is the product of significant "time and expense." *Rapid Temps, Inc. v. Lamon*, 2008-NMCA-122, ¶ 23, 144 N.M. 804, 192 P.3d 799 (stating that the district court did not err in finding that a client database was a "trade secret" where "the information contained in the database goes beyond [the defendant]'s general skills and knowledge, her recollection of client preferences, and information that one could easily obtain by consulting a phone directory."). "The existence of a trade secret ordinarily is a question of fact." *Pincheira v. Allstate Ins. Co.*, 2008-NMSC-049, ¶ 34, 144 N.M. 601, 190 P.3d 322 (internal quotation marks and citation omitted).

Here, Plaintiff alleges that its "confidential information and trade secrets" includes the following:

> a. Lists of information about each person or entity to whom CMC has sold, or made a proposal to sell, any products, goods, or services which comprise any part of CMC's business, or with which CMC has entered into an agreement to sell, or made a sale of any kind (hereinafter collectively referred to as the "CMC Clients");
>
> b. Lists of information about each person or entity from which CMC obtains products, whether by contract or otherwise, to sell to the CMC Clients (hereinafter collectively "CMC Providers");

c. All CMC Clients' contact information, including names and locations of individuals with decision-making authority and client preferences, needs, or requirements with respect to CMC's products, goods and services and geographical, seasonal, economic and other factors;

d. CMC Clients' financial information, including sales and product purchase histories, profit margins or markups, and information about the costs and expenses incurred by CMC in providing products and services to CMC Clients;

e. CMC's procedures, forms, methods and systems for marketing to CMC Clients and potential customers;

f. All CMC Providers' contact information, including names and locations of individuals with decision-making authority and the particular capabilities, product attributes and pricing details;

g. All of CMC's non-public business, expansion, marketing, development, financial and budgeting plans, strategies, forecasts or proposals;

h. All of CMC's pricing methodologies, including those based upon the particular needs of CMC Clients;

i. Technical information about CMC, CMC's products, CMC Clients, consultants, vendors, CMC Providers or any person or entity that provides services or information to CMC;

j. Any non-public financial information of any kind about CMC or its operations;

k. Non-public information disclosed to CMC by third parties, including CMC Clients and CMC Providers concerning CMC's products, goods or services, bids or bidding processes, product specifications, contracts, procedures, or business practices; and

l. CMC's employee/personnel lists, addresses and phone numbers, pay or commission rates, benefits and compensation packages, training programs and manuals, and other confidential information regarding CMC's personnel.

[Doc. 16-2, *First Amended Complaint*, ¶ 12] The degree to which this information is "readily ascertainable," "generally known," or valuable, and thus whether it is a trade secret, must ultimately be determined by the fact-finder. *Id.* For the purposes of the

present analysis, the Court accepts the well-pleaded facts in the *First Amended Complaint* as true. *Iqbal*, 556 U.S. at 679 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

Plaintiff alleges that the information disclosed was critical to development of a product similar to Warranty Forever®, which GDS did not offer at the time and which was important to TBAG. [Doc. 16-2, *First Amended Complaint*, ¶¶ 51, 52] Moreover, Plaintiff alleges that GDS's ability to provide services like CMC's was important to the joint venture proposed by Employees and Defendants. [Doc. 16-2, *First Amended Complaint*, ¶¶ 47-48, 50, 52, 55] Thus, these allegations indicate that Defendants and Employees stood to "obtain economic value" from the information by using it to create their own plan to offer or obtain a similar product. Plaintiff also alleges that the information at issue was gained by the Employees as a result of their positions with CMC, was specific to CMC, and was not generally known. [Doc. 16-2, *First Amended Complaint*, ¶¶ 13, 74] Finally, since Plaintiff also alleges that the information at issue is that which was disclosed occurred during a meeting in February, 2016, the *First Amended Complaint* is sufficiently specific to give Defendants notice of the scope of the alleged breach.

In addition, Plaintiff states that it had signed non-disclosure and non-compete agreements with the Employees that included a prohibition on disclosure of information. [Doc. 16-2, *First Amended Complaint*, ¶¶ 21-23, 26, 29] In the agreement, the Employees agreed that

21. . . . all "documents, records, files and information relating to [CMC's business] are and shall remain proprietary, confidential to and trade secrets of [CMC]."

[and]

22. . . . to "keep secret" and "not to disclose . . . or otherwise use" any of CMC's confidential information or trade secrets "for [their] own benefit" at any time during or after [their] working relationship with CMC.

[Doc. 16-2, *First Amended Complaint*, ¶¶ 21-22]  These allegations suffice to assert that Plaintiff sought to keep the information secret.

Defendants argue that Plaintiff's *First Amended Complaint* fails to state a claim because the information that Plaintiff claims is confidential is in fact Branch's own information or information disclosed to TBAG as a customer.  [Doc. 11, pg. 8; Doc. 9, pg. 6]  Defendants argue that "pricing and coverage limits" information is not proprietary because Branch knew what he was paying CMC and was not barred from disclosing that information.  Defendants state that "[i]n the absence of [an agreement to keep prices confidential], Mr. Branch was free to disclose that information, just as any customer is free to disclose prices when shopping for a better deal."  [Doc. 26, pg. 6; Doc. 11, pg. 8]  This argument is unavailing for two reasons.  First, it misstates the scope of Plaintiff's allegations.   Plaintiff alleges that the information disclosed by the Employees to Defendants included "CMC's pricing, margins, coverage limits and product costs associated with the products that CMC had been providing to TBAG."  [Doc. 16-2, *First Amended Complaint*, ¶ 72]  It further alleges that

73. At the time of the Godin Conference Call, Branch and Godin knew and understood that CMC's pricing, margins, coverage limits and product costs

[were] confidential and proprietary trade secret information belonging to CMC.

74. CMC's pricing, margins, coverage limits and product costs [were] *not information that TBAG had as part of its ordinary operations*, but rather, that information came directly from [the Employees], who had obtained or knew of the information through their past employment with CMC.

[Doc. 16-2, *First Amended Complaint*, ¶ 73-74 (Emphasis added)]   Thus, Plaintiff specifically alleges that the Employees disclosed information known only by the Employees as a result of their employment with CMC, not information known to TBAG as a customer.   *Cf. Joint Tech., Inc. v. Weaver*, No. CIV-11-846-M, 2011 WL 4639926, at *2 (W.D. Okla. Oct. 4, 2011) (holding that where the plaintiff had not alleged that the information was "not easily ascertainable or available generally to the public or plaintiff's trade," the plaintiff's allegations were "naked assertions devoid of further factual enhancement.").   In addition, while some of the categories listed by Plaintiff as confidential information may include information about TBAG, the categories are broader than Defendants suggest and encompass more than information related to TBAG. The precise contours of the information that qualifies as a "trade secret" will be an issue at trial.

Second, Defendants misconstrue the use of the word "pricing" as a noun, rather than a verb.   The "price" TBAG paid for CMC's services is a fixed figure, whereas the "pricing" used to develop that figure is a methodology.   *See* Merriam-Webster Dictionary, defining "pricing" as a verb meaning "to set a price on," available at https://www.merriam-webster.com/dictionary/pricing.   "As a general matter, confidential data regarding operating and pricing policies can qualify as trade secrets."   *Sw. Stainless,*

*LP v. Sappington*, 582 F.3d 1176, 1189 (10th Cir. 2009) (alterations, internal quotation marks, and citation omitted). Construing the *First Amended Complaint* in favor of Plaintiff, the Court finds that Plaintiff has sufficiently alleged that the information disclosed was not limited to information known to TBAG by virtue of being a CMC customer.

The next question is whether Plaintiff has adequately pled facts in support of its allegation that Defendants misappropriated its confidential information. "Misappropriation" means

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

> (2) disclosure of use of a trade secret of another without express or implied consent by a person who:

> (a) used improper means to acquire knowledge of the trade secret; or

> (b) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

> 1) derived from or through a person who had utilized improper means to acquire it;

> 2) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

> 3) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

> (c) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

§ 57-3A-2 (B). "Improper means" includes "theft, bribery, misrepresentation, breach or *inducement of a breach of a duty to maintain secrecy* or espionage through electronic or other means." § 57-3A-2 (A) (Emphasis added).

Plaintiff alleges that "Branch, TBAG, Godin and GDS used improper means to obtain CMC's trade secrets from [the Employees] because they induced [the Employees] to breach their duty to maintain the secrecy of the trade secrets by offering them financial incentives." [Doc. 16-2, *First Amended Complaint*, ¶ 97] It also alleges that the Employees owed a duty "to maintain its secrecy or limit its use" by virtue of their employment with CMC and that Defendants knew that the Employees owed this duty to CMC. [Doc. 16-2, *First Amended Complaint*, ¶¶ 43, 83] In support of these allegations, Plaintiff states that Defendants participated in a meeting in which the parties discussed how to work around the Employees' non-disclosure agreements, that Employees did in fact disclose trade secrets, and that, by payment of financial incentives and participation in a plan to move TBAG's business to GDS and in a joint venture, Defendants induced disclosure of trade secrets. [Doc. 16-2, *First Amended Complaint*, ¶ 50, 54, 68, 72, 76, 77] As evidence of the plan, Plaintiff points to 1) email between Godin and Musgrave about Warranty Forever®; 2) a December 2015 meeting between Employees and Defendants; 3) a February 2016 meeting between Employees and Defendants in which Godin was on the telephone; 4) change of employment of the Employees from CMC to TBAG; and 5) use of a "burner phone" to obscure communications between Musgrave and Defendants. [Doc. 16-2, *First Amended Complaint*, ¶¶ 50, 60, 61, 68, 78] These facts are sufficient to allege that there was "disclosure of use of a trade secret of another

. . . by a person who . . . at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use" and that the disclosure was induced by Defendants. § 57-3A-2 (B).

In sum, Plaintiff's *First Amended Complaint* adequately states a claim for a violation of the NMUTSA. Amendment, therefore, would not be futile and should be permitted.

To the extent that Defendants argue that Plaintiff's misappropriation claim must be dismissed because it is "duplicative" of the aiding and abetting claim, the Court disagrees. [Doc. 9, pg. 9] Defendants cite *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.* for this proposition. 147 F. Supp. 2d 1057, 1068 (D. Kan. 2001). In that case, after a bench trial, the court held that "to the extent this [breach of fiduciary duty] claim is based upon . . . misappropriation of trade secrets, it is duplicative of [the p]laintiffs' claim brought pursuant the Uniform Trade Secrets Act." *Id*. But that statement was related to whether the plaintiffs could *recover* for both claims, not whether both claims could be pled in a complaint. Here, even if the Court assumes without deciding that the misappropriation claim and aiding and abetting claim are duplicative, such duplication is not fatal to either claim at this stage. A party is "at liberty to state as many separate claims as he wished 'regardless of consistency', whether based upon legal or equitable grounds or both." *Blazer v. Black*, 196 F.2d 139, 144 (10th Cir. 1952); *Kaiser v. Bowlen*, 181 F. Supp. 2d 1200, 1203 (D. Colo. 2002) ("Alternative theories of

relief are permitted at the pleading stage of litigation."); Rule 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

**D. Civil Conspiracy**

"To state an action for civil conspiracy, there must be allegations in the complaint of (1) the existence of a conspiracy; (2) wrongful act done pursuant to the conspiracy; and (3) resulting damages." *Saylor v. Valles*, 2003-NMCA-037, ¶ 25, 133 N.M. 432, 63 P.3d 1152. "The existence of a conspiracy must be ple[]d either by direct allegations or by allegations from which a conspiracy can be inferred." *Id.* "To constitute an actionable civil conspiracy, there must be a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Isengard*, 1978-NMCA-117, ¶ 5. Here, Plaintiff made a number of allegations from which one may infer the existence of a conspiracy:

> 50. In the first or second week of December, 2015, Branch, [the Employees], Baez and Godin held a meeting at Branch's office in Artesia, New Mexico. The purpose of the meeting was to discuss implementing the plan to align with CMC's competitor, GDS, and to facilitate GDS creating a virtual replica of the Warranty Forever® product offered by CMC.
>
> . . .
>
> 53. Godin assured Branch, [the Employees and], Baez that he could, and would, develop a product to replace the Warranty Forever product with their assistance.
>
> 54. [The Employees] brought to the December, 2015 meeting copies of the non-compete agreements they had signed with CMC and there was discussion with Godin and Branch about how to work around the non-disclosure and non-compete provisions in those agreements during implementation of the plan. [The Employees] were still working for CMC at the time of the December, 2015 meeting.

55. The plan was discussed in the context of a joint venture between Branch, Godin, [and the Employees], in which each would profit from the venture. In so doing, Branch and Godin gave [the Employees] financial incentive to divert additional clients of CMC to GDS.

56. Prior to resigning as president of CMC on December 17, 2015, Musgrave had additional conversations with Godin about the plan to divert business from CMC.

. . .

61. On January 11, 2016, Godin sent an e-mail to Branch and Baez requesting information "pertinent to setting up the Lifetime Warranty (warranty forever replacement program)."

62. Branch instructed Baez to work with Godin to get him whatever information he needed in order to build the replacement products that GDS would provide TBAG. Some of the information Godin needed was not readily available to Baez or anyone else at TBAG.

63. In late January, 2016, Musgrave and Morgan advised Baez that they had contacted Godin and had arranged a conference call to provide additional information that Godin needed as part of the Warranty Forever® replacement program.

. . .

68. Within a few days of the TRO being entered, [the Employees,] Branch and Baez met in a conference room at one of TBAG's dealerships for the conference call that Musgrave and Morgan had arranged with Godin (the "Godin Conference Call").

. . .

72. The purpose of the Godin Conference Call was to provide GDS with CMC's pricing, margins, coverage limits and product costs associated with the products that CMC had been providing to TBAG, in furtherance of the plan to have GDS develop replacement products for sale to TBAG (and potentially other dealerships).

73. At the time of the Godin Conference Call, Branch and Godin knew and understood that CMC's pricing, margins, coverage limits and product costs was confidential and proprietary trade secret information belonging to CMC.

[Doc. 16-2, *First Amended Complaint*, ¶¶ 50, 53-56, 61-63, 68, 72-73]  Plaintiff also alleged that a wrongful act occurred as a result of these plans:

> 76. During the Godin Conference Call, [the Employees] did in fact disclose CMC's confidential information and trade secrets to Godin and GDS at the request of Branch and Godin.  Godin wanted to know everything that Branch, [and the Employees] could tell him about the Warranty Forever® product including all costs to CMC related to that product.

[Doc. 16-2, *First Amended Complaint*, ¶ 76]  Finally, as to damages, Plaintiff alleged that "[b]y acting together, defendants accomplished their improper objectives of bringing about economic harm to CMC by, among other things, diverting TBAG's account with CMC to GDS."  [Doc. 16-2, *First Amended Complaint*, ¶ 105]  It also asserts that TBAG's business with CMC totaled approximately $400,000 per year.  [Doc. 16-2, *First Amended Complaint*, ¶ 39]  Plaintiff has sufficiently pled facts addressing the elements of civil conspiracy in the *First Amended Complaint* and amendment of this claim would not be futile.

## III.    Conclusion

For the foregoing reasons, the Court finds that amendment of the *Complaint* as proposed in the *First Amended Complaint* would not be futile and **GRANTS** Plaintiff's *Opposed Motion for Leave to File an Amended Complaint* [Doc. 16].

Furthermore, grant of Plaintiff's *Opposed Motion for Leave to File an Amended*

*Complaint* renders the Defendants' *Motions to Dismiss* [Doc. 8, 9, Doc. 11] moot.  Both

*Motions* therefore are **DENIED** as moot.

      **SO ORDERED this 25th day of September, 2017.**

_____

**M. CHRISTINA ARMIJO**
**Chief United States District Judge**